# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DRIVE DEVELOPMENTS, INC.; | § | |
| BAE SYSTEMS TACTICAL VEHICLE | § | |
| SYSTEMS LP; and LARRY OSENTOSKI | § | |
|     Petitioners | § | |
| | § | CIVIL ACTION NO. 4:10-cv-1114 |
| V. | § | |
| | § | |
| MTS TECHNOLOGIES, INC. | § | |
|     Respondent | § | |

## DRIVE DEVELOPMENTS, INC. and LARRY OSENTOSKI'S
## <u>RESPONSE TO MOTION TO STAY CONFIRMATION</u>

**WATT BECKWORTH THOMPSON & HENNEMAN, L.L.P.**

Joseph G. Thompson III
Federal ID 16780
State Bar No. 00788534
1800 Pennzoil Place, South Tower
711 Louisiana Street
Houston, Texas 77002
Telephone: (713) 650-8100
Facsimile: (713) 650-8141

**ATTORNEY IN CHARGE FOR PETITIONERS, DRIVE DEVELOPMENTS, INC. AND LARRY OSENTOSKI**

# TABLE OF CONTENTS

Introduction and Summary .................................................................................................. 1

Background ........................................................................................................................... 4

Argument .............................................................................................................................. 9

    A.    Staying Confirmation of an FAA Arbitration Award would be an Extraordinary Action, Unprecedented in the Fifth Circuit. .................................... 9

    B.    MTS' Bad Faith Should Not be Rewarded or Permitted to Continue .......................................................................................................... 13

    C.    The Second Arbitration Presents No New Claims and Cannot Justify Staying the First. .................................................................................. 14

        (1)    There are no "New" Claims for a Second Arbitration. All MTS' Claims were Presented, Considered and Rejected in this Arbitration. ............................................ 14

        (2)    MTS Cannot Retroactively "Split" its Causes of Action and Refile part of them in a Second Venue. ................................ 17

    D.    Even if the Second Arbitration Were Proper, it Cannot Alter the Result of the First. ................................................................................................ 21

    E.    Delaying Confirmation would Greatly Prejudice DRIVE and Osentoski ....................................................................................................... 23

Conclusion ......................................................................................................................... 24

# **TABLE OF AUTHORITIES**

## **Cases**

*ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 329-30 (1994) ........................................... 14

*Bein v. Heath*, 47 U.S. 228, 247-48 (1848) ............................................................................ 14

*BHP Billiton Petroleum (Americas) v. Atlantia Offshore Ltd.*, --- S.W.3d ---, 2009
WL 4724688 (Tex. App. – Houston [1st Dist] 2009) ........................................................ 19

*C.D. Anderson & Co. v. Lemos,* 832 F.2d 1097, 1100 (9th Cir. 1987) ...................................... 19

*Cigna Ins. Co. v. Huddleston*, 986 F.2d 1418 (5th Cir.) .......................................................... 22

*Citgo Petroleum Corp. v. M/T Bow Fighter*, 2009 WL 960080 (S.D. Tex. 2009) ...................... 11

*Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 351-59 (5th Cir. 2009) ................... 9, 12

*Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 351-59 (5th Cir.
2009)(quoting 9 U.S.C. §9) ............................................................................................. 9

*Companhia de Navegacao Martima Netumar v. Amrada Parcel Service, Ltd.* ........................... 11

*Connecticut Light & Power Co. v. Local 420, Int'l Brotherhood of Elec. Workers*,
718 F.2d 14 (2nd Cir. 1983) ............................................................................................ 21

*Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906 (6th Cir.
2000) ............................................................................................................................... 22

*Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 175 (2d Cir.) ....................................................... 22

*General Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 250 (5th Cir.
1998) ............................................................................................................................... 20

*Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S.576 (2008) .......................................... 12

*Hewlett-Packard Co. v. Berg*, 61 F.3d 101 (1st Cir. 1995) .................................................. 11, 13

*Hudson v. Universal Studios*, 235 Fed.Appx. 788, 790 (2nd Cir. 2007) ................................... 19

*International Organization of Masters, Mates & Pilots v. Trinidad*, 803 F.3d 69
(2nd Cir. 1986) ................................................................................................................. 10

*International Union of Operating Engineers, Local 841 v. Murphy*, 82 F.3d 185
(7th Cir. 1996) ................................................................................................................. 22

*Legions Ins. Co. v. Insurance General Agency, Inc.*, 822 F.2d 541, 543 (5th Cir. 1987) ........................................................................................................... 9

*Mantle v. Upper Deck Co.*, 956 F.Supp. 719, 735 (N.D. Tex. 1997) ........................................... 20

*Miller Brewing Co. v. Ft. Worth Dist. Co.,* 781 F.2d 494, 499 (5th Cir. 1986)............................ 19

*Odell Assocs., Inc. v. Alton Oschsner Med. Foundation*, 2002 WL 10465 (E.D. La. 2002) ...................................................................................................... 11

*Prudential Securities Inc. v. Hornsby*, 865 F.Supp. 447, 451-2 (N.D. Ill. 1994) ......................... 22

*Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863 (1st Circ. 1981) ............................................................................ 19

*Wartsila Finland Oy v. Duke Capital LLC*, 518 F.3d 287, 294 (5Th Cir. 2008) ..................... 10, 13

## **Statutes**

9 U.S.C.A. § 9 ................................................................................................................... 9

9 U.S.C. § 12 .................................................................................................................... 9

# Introduction and Summary

1.      On March 31, 2010, after months of discovery and a four day evidentiary hearing, a Panel of three neutral arbitrators from the American Arbitration Association ("AAA") issued a unanimous award against MTS Technologies, Inc ("MTS"). The Panel awarded approximately $8,000,000 in damages and attorneys' fees to the DRIVE Parties and BAE. In a very strongly worded award, the Panel found that MTS acted in deliberate bad faith, both in filing the arbitration and in its conduct throughout the case. The Panel found this conduct was willful and frivolous. The evidence of MTS' misconduct so compelled the Panel that it awarded sanctions, actual damages and exemplary damages against MTS for having committed the intentional tort of abuse of process – all along with substantial damages for MTS' tortious interference, disparagement and other causes of actions on the "merits."[1]

2.      MTS does not challenge a single substantive ruling of the Panel. MTS' sole quibble with the award is to question whether it was appropriate for this Panel to state the obvious truth that MTS is precluded from relitigating its case in another forum, or whether Respondents are required to obtain that ruling, yet again, from a second tribunal.[2] What MTS does not reveal in its briefing is that this Panel already heard evidence on the claims MTS seeks to bring in the second arbitration, expressly considered those claims on the merits, and ruled

---

[1] The DRIVE Parties note for the Court that MTS' new local counsel, Haynes & Boone, did not represent MTS in the underlying proceedings – nor, apparently, is it representing MTS in a second arbitration. While MTS's litany of sins cannot be overlooked or whitewashed simply because it has retained new and untarnished counsel, DRIVE wishes to be clear that the comments herein concerning MTS' past conduct and future intentions are not intended to reflect on the conduct of Mr. Braughton, Mr. Trachtenberg or Haynes & Boone.

[2] MTS' sole complaint in its Petition for Partial Vacatur is that in the Final Reasoned Award, after having expressly rejected MTS arguments based on the Patent Assignment Agreements and having reviewed the claims MTS makes in the second arbitration, the Panel stated that it intends its award to constitute a *res judicata* and/or collateral estoppel bar to further litigation. As noted below, MTS does not challenge any of the substantive rulings of the Panel that make this a statement obviously correct; MTS simply believes that it is not up to this Panel to say so.

against MTS, rendering a take nothing judgment on precisely the same substantive issues MTS seeks to relitigate. After extensive testimony, mostly elicited by MTS, the Panel found the Patent Assignment Agreements – which are the sole basis of the second arbitration – did not cover DRIVE's products and that none of the former MTS employees (including those named in the second arbitration) had done anything to violate them. DRIVE and Osentoski also won a declaration that they have the absolute right to market their technologies. MTS does not even acknowledge these findings for this Court, much less dispute them in the Petition to Vacate. Thus, in a monument to form over substance, MTS complains about only about *who* gets to say "*res judicata*" without disputing any of the findings that do, in fact, make it *res judicata*. In essence, MTS seeks only to have the award reformed, not vacated.

3.      In the present Motion to Stay, MTS asks this Court to forgo confirmation of an admittedly valid award, possibly for years, so MTS can pursue a second arbitration involving claims that: (1) were, as a matter of law, necessary and compulsory claims in the first arbitration; (2) were actually litigated by MTS in the first arbitration; (3) *were expressly considered on the merits and explicitly rejected by the arbitration panel in its award*, and; (4) are not challenged in the Petition for Partial Vacatur. This is the context for this Motion to Stay: MTS wants this Court to reward MTS' undisputed past bad faith and gamesmanship with a stay so it can continue the same frivolous conduct that resulted in sanctions the first time.

4.      The Federal Arbitration Act ("FAA") states that a Court "must" confirm an arbitration award unless presented with valid statutory grounds for vacatur, and it is undisputed that MTS raises not a single challenge to the award's substance.

5.      No court in the Fifth Circuit has ever endorsed the notion that a District Court has the authority to refrain from confirming an award governed by the FAA. Indeed, MTS cites only

one case from *any* jurisdiction where a court stayed confirmation of an FAA arbitration award – and that was an unpublished 1997 case out of the Southern District of New York, which, astoundingly, issued the stay only after stating it entertained significant doubts about its authority to do so, and further recognized that stays should only be granted only in the most compelling circumstances. This is hardly convincing authority, particularly as one thing the Fifth Circuit has made abundantly clear is that courts should not read additional judicial authority into the strict language of the FAA.

6.      Worse, it is misleading for MTS to suggest it simply seeks a "stay." It asks that this Court refrain from enforcing this award *so that it can collaterally attack it in a subsequent proceeding*. This is an impermissible non-statutory attempt to "vacate" some or all of this award by obtaining a different result in a future proceeding and then come back to this Court and ask it to "reconcile" the two awards by resolving inconsistencies. This it cannot do: the FAA requires presentation of any grounds to vacate within three months of the award. MTS cannot stay confirmation and then return in a year or two and, in essence, seek to vacate portions of this award under the guise of "reconciling inconsistencies." Calling it a "stay" does not make it one. It is a collateral attempt to vacate the award, nothing more, and it is not permitted under the FAA or common law.

7.      The extraordinary nature of MTS' request is matched only by the uncleanliness of its hands. MTS does not challenge the Panel's findings – supported by sanctions and exemplary damages – that it brought and maintained the present arbitration in bad faith in order to cripple a competitor. Now, MTS asks this Court to make new law in the Fifth Circuit, perhaps in the entire country, in order to prolong the very proceeding it has already been determined to have brought in bad faith.

8.     The impact on the DRIVE Parties would be catastrophic.  Evidence before the Panel established that MTS' conduct already pushed DRIVE to the point of bankruptcy.  MTS now asks this Court leave to finish the job.  Further, MTS is a privately held company, 90% owned by Dan Perkins, an individual who was personally a key player in the underlying torts for which damages were assessed against MTS.  MTS proposes no bond, no security and no protection of any type to ensure its ability to satisfy the judgment.  Instead, MTS will no doubt utilize any extra time granted to distribute company assets to Mr. Perkins, looting itself into insolvency, and spending DRIVE into financial ruin with two more years of frivolous litigation.

### Background

9.     The factual background of the underlying dispute is contained in the Final Reasoned Award, attached as *Exhibit A*, and will not be repeated here.

10.     As to the procedural background, MTS' Motion to Stay omits many facts bearing significantly on the Motion to Stay and Petition for Partial Vacatur.

11.     MTS initiated this arbitration against BAE and the DRIVE Parties in the summer of 2008.  MTS' Statement of Claim asserted that Osentoski copied MTS' ePULSE technology, stole its trade secrets, and breached fiduciary duties to the MTS.  *Exhibit B*.  The gravamen of the complaint was that Osentoski and DRIVE utilized technologies owned by MTS in performing work for BAE.

12.      Initially, Osentoski and DRIVE intended to object to participating in the arbitration, because neither Osentoski nor DRIVE had an arbitration agreement with MTS.  The only arbitration agreements were the MTS-BAE Purchase Order and the DRIVE-BAE Purchase Order – in other words, MTS and DRIVE each had an arbitration agreement with BAE, but there was none between MTS and DRIVE.  MTS conceded this, but argued that the arbitration clauses

with BAE had a broad sweep, entitling it to compel even non-signatories to arbitrate, and encompassing any claim remotely connected to the performance of the BAE Purchase Orders, including its claims with its former employee, Osentoski. See **Exhibit C**, *Claimant's Response to DRIVE and Osentoski Motion to Dismiss*. That, of course, is in direct contrast to the position MTS now takes, suggesting it could not have arbitrated against its other former employees, Grattan and Harris in the present case when that is <u>precisely</u> what it did with Osentoski.

13. Ultimately, DRIVE and Osentoski consented to participate in the arbitration <u>*on the express condition that they be permitted to bring any and all counterclaims in this proceeding*</u>. See **Exhibit D**. This condition was accepted. Accordingly, on April 20, 2009, DRIVE and Osentoski filed their Answering Statement and Counterclaims. **Exhibit E**.

14. MTS did not object to the jurisdiction of the Panel to consider DRIVE's counterclaims (nor could it, given its acceptance of DRIVE's right to lodge them). The claims were tried without objection by MTS. Indeed, even in retrospect, MTS does not contest the jurisdiction of the Panel to rule on these claims.

15. These counterclaims are important for more than just the damages award. In addition to causes of action for tortious interference, disparagement, and defamation, the DRIVE Parties sought declaratory and injunctive relief as to the ownership of DRIVE's technologies. Specifically, DRIVE sought a declaration that DRIVE's technologies are not the property of MTS and that "DRIVE had the full authority to use, sell, assign and market the DRIME module or other technologies as it sees fit." **Exhibit E** at ¶50. Additionally, the DRIVE Parties sought an injunction prohibiting MTS from claiming that DRIVE or Osentoski stole any trade secret, violated any legal duty to MTS or lacked the legal right to manufacture, market or distribute telediagnostic technology, including DIME. **Id.** at ¶52.

16.     The parties prepared an Agreed Scheduling Order which was subsequently entered by the Panel.  *Exhibit F*.  The Order provided for several months of discovery, from June to December.  The deadline for designating experts for claims for affirmative relief – as well as providing a full report – was October 13, 2009.  MTS did not designate an expert until the following day.  It then announced that it its expert was unprepared to proceed because MTS had not requested the necessary information for him to form an opinion.  *Exhibit A* at ¶¶ 26-27.  MTS did not even provide Mr. Shadwell with a copy of the protective order until almost a month later.  *See* Shadwell Report, filed under seal as Exhibit C to MTS' Petition for Partial Vacatur, at 1.  After the DRIVE Parties voluntarily provided data on an expedited basis, the Panel ordered MTS to produce an expert report on December 14, 2009 – a mere five weeks before trial.  On the date the report was due, MTS announced that its expert found no evidence of copying and sought permission to de-designate its expert and withdraw its infringement claims.  *Exhibit A* at ¶ 28.  The Panel took this request under advisement.  Ultimately, it was denied and without objection by MTS, the Panel considered and ruled upon all of the technology infringement/theft claims.  *Id.* at ¶¶ 32-36, 39.

17.     MTS' unsuccessful attempt to jettison its infringement claims in this case was part of its larger strategy of gamesmanship.  Simultaneously with its request to dismiss those claims without prejudice in this case, it filed a second arbitration in Washington, DC.  *Exhibit G*.  This latter arbitration arises from exactly the same nexus of facts as the first.  MTS sued all the same parties, except that it added, in addition to Osentoski, two additional former MTS employees that now work for DRIVE, Mike Grattan and Aaron Harris.  Whereas in the first arbitration, MTS alleged that DRIVE and Osentoski lacked the right to the technology because of copyright infringement and trade secret theft, the second arbitration reframed the exact same

6

claim, but alleged that Osentoski, Grattan and Harris had contractually assigned away those claims in the "Patent Assignment Agreements." In short, at exactly the same moment it was attempting to jettison its intellectual property claims in this arbitration for lack of evidence, it was filing a second arbitration in a new venue to start all over again.

18. There is nothing new or different about MTS' claims in the second arbitration. MTS had been expressly alleging ownership of these technologies from the outset of the present case. MTS' original Statement of Claim asserts that "MTS developed and owns that certain system and method for vehicular fleet monitoring" and "[i]n performing the Drive Purchase Order, DRIVE has used proprietary MTS Wireless ePulse technologies." **Exhibit B** at pp. 1-2. In its answers to interrogatories, MTS repeatedly asserts ownership of the technology as a basis for its claims, including this specific answer to DRIVE's first interrogatory:

> Claimant contends that all of the deliverables and work product of the MTS Purchase Order, all of the deliverables and work product of CLAIMANT in performing projects for other clients involving ePulse and Milpulse Technologies, as well as all research and development work product in connection with such technologies is proprietary to MTS as the developer thereof, and is owned exclusively by MTS. Bill Oakley has knowledge concerning such contentions.

**Exhibit H**, Interrogatory 1.

19. As if it were not clear enough that MTS' claims placed the ownership in issue, MTS has consistently ignored (just as it did in its filings with this Court) that DRIVE's counterclaims specifically sought declaratory relief as to the ownership of the technology. Thus, if MTS wished to present a claim based on the Patent Assignment Agreements, it was obligated to do so in this case. More importantly, if, as MTS now seeks leave to go argue in Washington, the Patent Assignment Agreements constituted a reason that Osentoski, Harris, Grattan and

DRIVE lacked the right to develop this technology, that is something that it was obligated to present herein, as a defense of DRIVE's declaratory judgment action.

20.     In fact, MTS <u>did</u> introduce these documents into evidence.   The Patent Assignment Agreement was used by MTS during depositions, and was submitted to the Panel as Exhibit 75.   In fact, the <u>only</u> additional exhibits MTS introduced beyond the exhibits used during the depositions were the patent documents as Exhibits 100-103 in the Arbitration.   These documents – Exhibits 75 and 100-102 – are attached as *Exhibit I*.   MTS also elicited voluminous testimony about those very documents from its sole company witness, Bart Whitman.  *Exhibit J* (Tr. Vol. I, pp. 109-120) and cross-examined Osentoski extensively on these documents.   Of the 88 pages of MTS' counsel's initial examination of Osentoski, 84 are exclusively devoted to this issue. *Exhibit K* (Tr. Vol. II pp. 112-196).   Only four pages of his examination relate to anything else.   It was the core of MTS' presentation.   Further, on cross-examination and without any substantive refutation by MTS, Osentoski explained precisely why the Patent Assignment Agreements did not relate to the subject technologies.  *Id.* (remainder of transcript excerpt).   The Panel agreed.  *Exhibit A* at ¶¶ 32-33.

21.     Lastly, most importantly, and completely unchallenged by MTS, the Panel's award expressly addressed these claims, noting they were compulsory claims, were considered on the merits, and were rejected.  *Id.* at ¶¶ 32-36, 38-40 and §§ 2-5 at pp. 9-10.   Thus, the Panel has already issued a judgment adverse to MTS on the very issues it seeks to relitigate.   This will be discussed in detail below.

## <u>Argument</u>

**A.**   **Staying Confirmation of an FAA Arbitration Award would be an Extraordinary Action, Unprecedented in the Fifth Circuit.**

22.     No case in the Fifth Circuit has ever authorized a Court to stay confirmation of an arbitration award governed by the FAA.   On the contrary, the Fifth Circuit has strongly declared that the District Court should NOT read into the FAA any authority not expressly present.   For example, unlike other circuits, the Fifth Circuit expressly rejected efforts to "read into" the FAA common law grounds for challenging arbitration awards.

23.     The FAA states that upon a timely motion to confirm an arbitration award, "the court ***must*** grant such an order unless the award is vacated modified, or corrected as prescribed in sections 10 and 11 of this title."   9 U.S.C.A. § 9 (emphasis added).   The Fifth Circuit recently went out of its way underscore this point: "the statutory language means what it says: 'courts *must* [confirm the award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.' ... (emphasis added), and there's nothing malleable about 'must.'" *Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 351-59 (5th Cir. 2009)(quoting 9 U.S.C. § 9).   In light of this mandatory confirmation requirement, confirmation hearings are intended to be expedited, summary procedures.   *Legions Ins. Co. v. Insurance General Agency, Inc.*, 822 F.2d 541, 543 (5th Cir. 1987)("Arbitration [confirmation] proceedings are summary in nature to effectuate national policy favoring arbitration, and they require expeditious and summary hearing...")(internal quotation omitted).

24.     The FAA provides a single statutory ground for staying confirmation of an award: *when the motion to stay is necessary for consideration of a <u>timely</u> motion to vacate or modify the award*.   9 U.S.C. § 12.   The FAA provides a losing party three months to move to vacate and this

9

sensible rule authorizes the Court to stay confirmation so that a party has time to do so. That is the _only_ ground for a stay contained in the FAA, and it is only authorized for this reason. The provision reads:

> _For the purposes of the motion [to vacate or modify]_, any judge who might make an order to stay the proceedings in an action brought in the same court may make an order...staying the proceeding of the adverse party to enforce the award.

U.S.C.A. § 12 (emphasis added). MTS' briefing mischaracterizes this provision. When MTS quotes it, it lops off the first clause of the sentence (italicized above) in order to suggest that the stay is entirely within the court's discretion. When one reads the language MTS omitted, it is clear that any authority to stay under the FAA is expressly limited to allowing a timely filed petition for vacatur to be presented. The FAA does not say that a party can move to stay confirmation of an award for any other reason, much less because of legal disputes in another jurisdiction.

25. No Fifth Circuit case has ever endorsed the notion that a District Court can stay enforcement of a valid arbitration award, let alone one governed by the FAA. Indeed, even in the context of the New York Convention, which lacks the "must confirm" language and for which some other jurisdictions have found an implied discretion to stay confirmation, the Fifth Circuit has pointedly refused to consider the issue. _Wartsila Finland Oy v. Duke Capital LLC_, 518 F.3d 287, 294 (5Th Cir. 2008).

26. With few exceptions, the cases cited by MTS in support of its assertion of authority to stay do not arise under the FAA at all, but other arbitration statutes with different provisions. _See, e.g._, _International Organization of Masters, Mates & Pilots v. Trinidad_, 803 F.3d 69 (2nd Cir. 1986) (issuing stay in labor arbitration based on specific doctrine of deference to NLRB, a factor not present here); _Hewlett-Packard Co. v. Berg_, 61 F.3d 101 (1st Cir.

1995)(finding equitable authority under New York Convention). Many are outside the context of confirmation proceedings, addressing the entirely different proposition of whether a court should stay related *litigation* while a related arbitration is pending. *See, e.g., Citgo Petroleum Corp. v. M/T Bow Fighter*, 2009 WL 960080 (S.D. Tex. 2009); *Odell Assocs., Inc. v. Alton Oschsner Med. Foundation*, 2002 WL 10465 (E.D. La. 2002). Thus, not only does MTS rely exclusively on cases from outside this Circuit, it relies on cases that with only one exception do not even involve the FAA.

27. Reviewing the cases cited by MTS, it appears only a single case involved a stay of confirmation of an award in an arbitration governed by the FAA, and it is hardly compelling support for MTS' extraordinary request. *Companhia de Navegacao Martima Netumar v. Amrada Parcel Service, Ltd*, 1997 WL 16663 at *7 (S.D.N.Y. 1997)., is the unreported 1997 decision of a New York District Court. In that case, *after expressly noting it was "in doubt about its ability to do so,"* the Court stayed enforcement of an arbitration award so the matter could be remanded to the same Panel for consideration of additional claims it previously declined to consider. 1997 WL 16663 at *7 (S.D.N.Y. 1997). These facts are directly opposed to the facts in the present case.

28. In *Amrada*, the Court stayed the award to remand the case to the <u>same Panel</u> to consider additional claims <u>that had not been previously submitted to it.</u> Here, the Panel expressly stated that it fully considered MTS' claims with respect to the Patent Assignment Agreements, MTS presented its evidence, and without any objection, this Panel rejected those claims. In contrast to the *Amrada* case, MTS seeks permission for an entirely new arbitration, from scratch, with a new panel, to hear claims that this Panel not only fully addressed, but expressly stated that it was fully addressing with the intent of bringing finality to the entire

dispute.  Here, MTS' stated goal is to create inconsistent results in the second arbitration in the hope that it can force a Court to "reconcile" the two awards.  Neither *Amrada* nor the other cases cited by MTS involve a situation where a stay was granted in order to relitigate previously decided claims.

29.     MTS bases its legal argument on the notion that a court has a common law right to control its docket, and that this right should be "imported" into the FAA, despite the mandatory "must confirm" language in the Act.  While the Fifth Circuit has not been presented with this specific issue, we do know that it conclusively rejected similar attempts to use common law doctrines to depart from the strict letter of the FAA. The Fifth Circuit demonstrated this as recently as last year when it split from Second and Sixth Circuit holdings by emphatically rejecting all common law grounds for vacating arbitration awards, including the two long-recognized grounds of "manifest disregard of the law" and "contrary to public policy." *Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 351-59 (5th Cir. 2009).[3]  The court went out of its way to make the point: "the statutory language means what it says: 'courts *must* [confirm the award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.' ... (emphasis added), and there's nothing malleable about 'must.'" *Citigroup Global*, 562 F.3d at 351-59.  In light of the above, it is of little persuasive value for MTS to cite a laundry list of cases in other circuits staying awards on substituted statutory bases. The Fifth Circuit strictly construes FAA language, and MTS asserts no statutory ground for a stay.

---

[3] The *Citigroup Global* decision heavily and approvingly quoted the recent Supreme Court decision *Hall Street Associates, L.L.C. v. Mattel, Inc*., 552 U.S.576 (2008) (*e.g.,* "We hold that the statutory grounds are exclusive"; "We agree with the Ninth Circuit that they are [exclusive]"; "We now hold that §§10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification"; "...in holding that §§10 and 11 provide exclusive regimes for the review provided by the statute...").

30.     Moreover, it is misleading for MTS to suggest that all it seeks is a "stay."  MTS seeks far more.   By its own admission, it seeks to stay confirmation in this case so it can collaterally attack the award in another arbitration and then come back to this Court, or a Court in the District of Columbia, and "reconcile" conflicting findings.   In other words, MTS seeks a stay so that it can, it hopes, deliberately create inconsistencies with the existing award and then come back and vacate portions of this award.

**B.     MTS' Bad Faith Should Not be Rewarded or Permitted to Continue**

MTS comes before this Court having been adjudicated by the Panel of having initiated this proceeding in bad faith and conducted itself in bad faith during the arbitration.  *Exhibit A* ¶¶54-56.  The Panel found that MTS engaged in a pattern of intentional, willful and malicious conduct in order to destroy a competitor.  *Id.* at ¶¶46-52.  The Panel found for DRIVE on the abuse of process claim precisely because it determined MTS undertook this arbitration with the illegitimate intent to abuse the litigation process in order to cripple DRIVE.  *Id.* at ¶56.  MTS does not appeal or even dispute these findings.  Thus, to say MTS comes before this Court with "unclean hands" is a monumental understatement.

31.     As noted in the previous section, not only has the Fifth Circuit never endorsed a District Court's authority to stay confirmation of an FAA arbitration award, it expressly declined to take up the issue even in other contexts.  *Wartsila Finland Oy v. Duke Capital LLC*, 518 F.3d 287, 294 (5th Cir. 2008).  Of additional import to the present argument, is that even in describing the *possibility* of a stay, the Fifth Circuit noted, as did the First Circuit did, *that the only grounds for doing so would be in _equity_*.  *Id.* ("[T]he First Circuit recognized that certain equitable considerations could lead a district court to exercise its inherent authority to grant a stay of enforcement."), citing *Hewlett-Packard Co., Inc. v. Berg*, 61 F.3d 101, 106 (1st Cir. 1995).

Obviously, with no statutory basis for staying an award in this context, the only source of such authority could be equity.

32.     Thus, it is highly relevant that MTS comes to this Court with unclean hands – and in particular that its hand are unclean precisely because it has been abusing the litigation process for the last year and half. "The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abetter of iniquity." *Bein v. Heath*, 47 U.S. 228, 247-48 (1848). "The unclean hands" doctrine closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 329-30 (1994).

33.     What MTS seeks is a continuation of precisely the same bad faith process that led the Panel to sanction it and award exemplary damages in the first place. MTS asks the Court to stay enforcement of an award for which it concedes on appeal every single material fact finding – so that it can drag out proceedings for another two years, collaterally attack the award it lost and then come back to a District Court and file a renewed motion for vacatur under the guise of having the Court "reconcile" the two awards. It is hard to imagine circumstances where equitable relief is less justified.

**C.     The Second Arbitration Presents No New Claims and Cannot Justify Staying the First.**

*(1)     There are no "New" Claims for a Second Arbitration. All MTS' Claims were Presented, Considered and Rejected in this Arbitration.*

34.     MTS had its day in Court. MTS argued in this arbitration that the ePULSE technology was its proprietary property, that the DRIVE Parties copied it, infringed on its

14

copyright and stole trade secrets.  Further, the DRIVE Parties' counterclaim for declaratory and injunctive relief – ruled upon by the Panel without objection by MTS – conclusive resolved for all time the question of whether DRIVE and Osentoski own the right to this technology.

35.     Recall, MTS' sole assertion in the second arbitration is that DRIVE, Osentoski, Grattan and Harris violated Patent Assignment Agreements by utilizing proprietary MTS technologies in DRIVE's DIME product, and thus none of them have the right to the technology. In reaching its ruling, the Panel necessarily and expressly found that the Patent Assignment Agreements were inapplicable and that Osentoski, Grattan, and Harris violated no duty to MTS.[4] The Panel considered MTS' claims on the merits and, without objection by MTS, rejected them.

36.     This was not a surprise to MTS.  MTS fully participated in the trial.  MTS introduced into evidence the Patent Assignment Agreements at issue in the second arbitration. Indeed, this was the core of its presentation.  Of MTS' counsel's 88 page initial examination of Larry Osentoski, 84 pages pertained to the patent agreements.  MTS did not object to the scope of the hearing, did not object to consideration of DRIVE's counterclaims and actively

---

[4]The fact that the Panel's award in this case bars future claims by MTS against Osentoski and DRIVE arising out of this nexus of fact is so obvious that no argument should be required.

However, although this is more properly an issue for MTS' Petition for Partial Vacatur, MTS argues that because it added two additional parties in the second arbitration, Grattan and Harris, who were not before the Panel in this proceeding it should be free to relitigate claims against them.  This tactic fails for two reasons.

First, all of the Patent Assignment Agreements are identical and this Panel has already issued a declaratory judgment as to their meaning, finding that MTS is wrong and that the assignments have nothing to do with the technology at issue.  Thus, any attempt by MTS to relitigate the *meaning* of these agreements would be barred by *res judicata*.

Second, like Osentoski, Grattan and Harris are now employees of DRIVE.  MTS claim in the second arbitration is that all three violated their obligations to MTS under the assignments by contributing to the development of DRIVE's technology and, thus, DRIVE lacks the right to sell DIME.  The Panel herein expressly considered and rejected that claim, because it was necessarily implicated by DRIVE's request for declaratory judgment as to its right to market the technology.  Thus, MTS is collaterally estopped from seeking an inconsistent result by relitigating this lost issue against the individuals.

participated – indeed instigated – hours and hours of testimony about the patent agreements that it now asks leave from this Court to go relitigate.

37.     It is beyond question that the Panel considered all the evidence and issued rulings on the merits of the claims MTS wishes to refile – rulings that MTS does not challenge in its Petition for Partial Vacatur.  Consider the following rulings in the Final Reasoned Award – ***none of which are challenged by MTS***:

- The testimony of multiple witnesses established that "MTS' technologies were neither novel nor proprietary, that DRIVE developed its module independently, that MTS had no protectable interest in ePULSE/milPULSE, and that DRIVE and Osentoski did not utilize any MTS materials…." ***Exhibit A*** at ¶30;

- "The Panel considered the Patent Assignment Agreements, Provisional Patent Application, and Non-Provisional Patent Application, and rejects all infringement claims on the merits after consideration of all the evidence." ***Id.*** at ¶32.  "MTS introduced the Provisional and Non-Provisional Patent Applications and offered testimony about them which was considered.  However the evidence established that the Provisional and Non-Provisional Patent Applications are immaterial." ***Id*** at ¶34.

- "The Panel concludes that the Patent Assignment Agreements related not to ePULSE/milPULSE, but rather to a proposed technology for modifying the off the shelf WiFi modules currently in use in order to reduce latency of transmission.  MTS never made this invention.  ePULSE /milPULSE do not embody this technology and the evidence established that DRIVE's technology does not either.  ***The Panel determines that the Patent Assignment Agreement does not apply to ePULSE, milPULSE, DIME or any other derivative technology of DRIVE.***" ***Id.*** at ¶33 (emphasis added).

- "[T]he Panel having considered all of MTS' arguments, evidence, and assertions concerning the applicability of the Patent Assignment Agreement, Provisional Patent Application, and Non-Provisional Patent Application, rejects them and rules that nothing in the Patent Assignment Agreements, Provisional Patent Application, and Non-Provisional Patent Application limits or bars Osentoski or DRIVE from designing, developing, or marketing its DIME technology or any derivations thereof.

- "The Panel denied MTS' motion to consolidate this arbitration with the new arbitration ***since the new arbitration claims are compulsory counterclaims in this arbitration***." ***Id.*** at ¶38 (emphasis added).

- "The Panel finds that any potential claim against Osentoski or DRIVE (including by virtue of its employees Harris and Grattan's work for DRIVE)….concerning the Patent Assignment Agreements arose out of the same nexus of fact as its infringement claims and DRIVE's claims for declaratory judgment.  The Panel determines that these infringement

claims against Osentoski, Harris and Grattan were compulsory defenses and/or counterclaims, required to be asserted in this arbitration." ***Id.*** at ¶39.

MTS disputes not a single one of these findings. It is unquestionable that MTS was required to assert the Patent Assignment Agreement claims in this arbitration, that it did present them, that this Panel considered the claims/defenses based on the Patent Assignment Agreements on the merits, that MTS had the opportunity to litigate them, <u>and that they were rejected</u>. The conclusion of the award, which is the actual order of the Panel, makes this clear as well:

- "The Panel, having considered all the evidence presented, enters a declaratory judgment as follows: (A) DRIVE's technologies are not a trade secret, copyrighted, or patented information or material of MTS or any other company; (B) DRIVE's DIME module is not a trade secret, copyrighted, or patented information or other material of MTS or any other company; *(C) DRIVE has the full authority to use, sell, assign, and market the DIME module or derivations thereof as it sees fit*…" ***Id.*** at p. 9 (emphasis added).

And the coup de gras:

- "In connection with the granting of this declaratory relief*, the Panel determines, finds and declares that neither Osentoski nor DRIVE Developments itself, or through the actions of Mike Grattan or Aaron Harris, has violated any provision of the Patent Assignment Agreements, and that none of DRIVE's DIME module or derivations thereof infringe upon or are violative of the Patent Assignment Agreements, or the Provisional or Non-Provisional Patent Applications." Id.* at p. 9-10.

Again, MTS has challenged neither of these rulings. It defies logic and reason for MTS to suggest that somehow the Patent Assignment Agreement Claims are "unresolved" or that this award should be equitably stayed so another Panel can re-decide them. These claims were mandatory in this case, they were actually tried, and they were lost. MTS is not entitled to another bite at the apple.

    *(2)    MTS Cannot Retroactively "Split" its Causes of Action and Refile part of them in a Second Venue.*

    38.    Rather than acknowledge, far less address, the fact that the claims it seeks to present to a second Panel were expressly considered and rejected by the first Panel, MTS simply

states that it has claims under the Patent Assignment Agreements that are arbitrable in Washington, D.C. MTS then asserts offhandedly, that "[i]n accordance with the terms of the Patent Assignment Agreements, MTS could bring those claims <u>only</u> in a D.C. arbitration." Motion to Stay at 5 (emphasis added). The suggestion, therefore, is that the first Panel lacked jurisdiction to hear these claims. MTS does not directly come out and state because it is so obviously wrong – and of course it has not challenged the actual award of the first Panel where it DID rule on these claims. However, it is the hidden and false premise of its entire argument, because if the first Panel had jurisdiction to hear these claims, then the second arbitration is clearly barred.

39.     It is incorrect for MTS to suggest that the Patent Assignment Claims could "only" be heard in Washington, D.C. The chief fallacies in MTS' logic are that: (1) the incorrect notion that a claim cannot be covered by two different arbitration agreements, and therefore properly arbitrable in multiple venues; (2) that the ownership claims could not be tried by consent in Texas, which they were, and; (3) that MTS has not waived its objection to this Panel's adjudication of these claims, by failing to object prior to trial, during trial, or in its Petition to Vacate.

40.     To be sure, claims under the Patent Assignment Agreements *could* have been arbitrated in D.C., but that does not mean they were not *also* properly arbitrable in Texas. <u>MTS itself initiated the ownership fight in Texas</u>, claiming that the BAE provisions were broad enough to encompass non-signatories, claims between non-signatories, and even a fiduciary duty claim against its former employee. ***Exhibit C***. Having put ownership in issue in this case, consented to counterclaims on the ownership claim, and consented without objection to the trial of these issues at final hearing, MTS cannot come back now, after losing, and claim it is entitled

18

to second bite at the apple.  It is black letter law that MTS' patent claims were compulsory

claims in this arbitration.[5]

41.     MTS was obligated to raise not only all of its affirmative claims arising out of this

nexus of facts, but any and <u>all</u> defenses to DRIVE's counterclaims.  This would include any

defense based on an alleged contractual right to the technology by virtue of, for example, the

Patent Assignment Agreements.  *C.D. Anderson & Co. v. Lemos,* 832 F.2d 1097, 1100 (9th Cir.

1987).  In a case directly on point, the Second Circuit held that dismissal of a breach of contract

claim (i.e., exactly what MTS asserts in the new arbitration) on *res judicata* grounds was

appropriate where factually identical copyright infringement and unfair competition claims had

been previously raised in an earlier suit.  *Hudson v. Universal Studios*, 235 Fed.Appx. 788, 790

(2nd Cir. 2007).  Thus, if MTS wished to assert that the Patent Assignment Agreements created a

contractual bar to the DRIVE Parties' telediagnostic work, it was obligated to do so in <u>this</u>

arbitration, not only as a compulsory claim arising out of the same nexus of facts, but as a

---

[5]The test is straightforward:

- Whether the rights or interests in the first arbitration would be impaired or destroyed by prosecution of the
  second one;
- Whether substantially the same evidence is presented in the two actions;
- Whether the two suits involve infringement of the same right; and,
- Whether the two suits arise out of the same transactional nucleus of facts.

*C.D. Anderson & Co. v. Lemos*, 832 F.2d 1097, 1100 (9th Cir. 1987).  The Patent Assignment Claims were compulsory counterclaims/defenses that had to be asserted in <u>this</u> proceeding or be barred by principles of *res judicata*, which are applicable to arbitration claims as well as lawsuits.  *Id.; Miller Brewing Co. v. Ft. Worth Dist. Co.,* 781 F.2d 494, 499 (5th Cir. 1986)("parties should be barred from seeking relief from arbitration panels when, under the doctrine of *res judicata*, they would be barred from seeking relief from courts").

The result is that MTS has no right to bring a second, competing, arbitration involving the same claims.  The FAA authorizes the second arbitration to be stayed or enjoined.  *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.,* 643 F.2d 863 (1st Circ. 1981); *BHP Billiton Petroleum (Americas) v. Atlantia Offshore Ltd.,* --- S.W.3d ---, 2009 WL 4724688 (Tex. App. – Houston [1[st] Dist] 2009).

defense to DRIVE's counterclaims. The law on this could not be clearer. It is ironic that the very basis for MTS Motion to Stay – its desire to create inconsistent results – is precisely the key factor in the case law that requires that the second arbitration be barred by *res judicata*.

42. Moreover, the express condition placed by DRIVE and Osentoski before agreeing to join this arbitration was that MTS agree that all counterclaims could be tried as well. ***Exhibit D***. MTS consented. The counterclaims were filed, placing squarely in issue DRIVE's right to market this technology. ***Exhibit E***. MTS never objected or argued that the Houston Panel lacked jurisdiction to hear these claims, or that they were not properly arbitrable in Houston, or anything like it.

43. In any event, the law is quite plain that MTS cannot, at this late date, having tried the case already, lodge an objection to the jurisdiction of the first Panel or argue that it considered claims that were not properly arbitrable. That objection, even if it had merit, was long ago waived. "[A] claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrator to act." *General Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 250 (5th Cir. 1998); *Mantle v. Upper Deck Co.*, 956 F.Supp. 719, 735 (N.D. Tex. 1997)("defendants have waived their objections to the Tribunal's authority to address the arguably-independent tort claim, because they failed to object to arbitrability of the claim during the hearing. It is well established that a party may not participate in arbitration without objecting to the arbitrator's authority to address a particular issue, only to challenge the authority of the arbitrator to address the issue after obtaining an unfavorable result."). Presumably because MTS is well aware that it long ago waived any objection to the Panel's jurisdiction over all ownership claims it does not expressly state that it is doing so. However, by suggesting implicitly that the second proceeding could

proceed because "only" it could decide these matters, that is precisely what MTS indirectly – and impermissibly – attempts to do.

**D.      Even if the Second Arbitration Were Proper, it Cannot Alter the Result of the First.**

44.      MTS seeks to stay confirmation of this award until the conclusion of the second arbitration, which could take upwards of two years.  MTS admittedly then intends to seek, under the guise of "reconciling" the awards to vacate or modify this award.  This is procedurally impossible.

45.      First, MTS cites no case in which a Court has permitted a second arbitration to proceed, specifically in order to relitigate issues lost in the first one, with the intent of "reconciling" the two awards by vacating and modifying the first award.  The sole case cited by MTS in support this unprecedented theory is *Connecticut Light & Power Co. v. Local 420, Int'l Brotherhood of Elec. Workers*, a case that involved an entirely different situation.  718 F.2d 14 (2nd Cir. 1983).  In *Connecticut Light*, the Court did not, as MTS asks this Court to do, create the conflict or even the opportunity for the conflict.  Rather, the *Connecticut Light* court was presented with two different NLRB arbitration awards construing the very same contractual requirements, a *fait accompli* – arbitrations that involved different parties and had proceeded independently of one another.  That is far from the situation here, where MTS asks this Court to permit it, in advance, to create the very inconsistencies that will later have to be reconciled.  Further, unlike FAA arbitrations, NLRB arbitrations are governed by a specific set of principles that recognize that successive arbitrations will likely involve the same collective bargaining agreements, and the doctrine has evolved, specifically in the labor context, to allow a court to reconcile any differences.

46.     That is not the situation under the FAA.  Under the FAA, a party gets only three months in which to advance any grounds for vacating the arbitration award.  9 U.S.C.A. §12. Any grounds not advanced within that time period are waived.  *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 175 (2d Cir.); *Cigna Ins. Co. v. Huddleston*, 986 F.2d 1418 (5th Cir.).  There is no ability to move for vacatur after three months and, of relevance, there is no common law exception to this three month period.  *Florasynth*, 750 F.2d at 175.  Thus, having not challenged any of the substance of the award, MTS cannot come back in a year or two and advance new grounds for vacatur and/or modification based on an award in another arbitration.

47.     Federal courts reject such gamesmanship, denying motions to stay in favor of additional arbitrations designed to create inconsistent results.  *International Union of Operating Engineers, Local 841 v. Murphy*, 82 F.3d 185 (7th Cir. 1996)("Murphy may not now rebuff the Union's motion to confirm by a belated attack on the award dressed up as a motion to stay district court action and compel additional arbitration").  After summarizing the undisputed law in several circuits and states, the District Court for the Northern District of Illinois hit the nail on the head as it rejected precisely the tactic MTS employs in this case:

> The reasoning of these cases is both persuasive and unsullied by contrary authority. Because the policies behind section 10 [of the FAA] would be eviscerated if it were only an optional way to modify an arbitration award, an attempt to modify an award by a route or mechanism other than section 10 must be enjoined. Like the collateral actions in the cases above, Hornsby's attempt to arbitrate an "independent" fraud claim against Prudential is, in reality, an attempt to augment and modify the first arbitration award…. [S]ection 10 is the only way to obtain redress for injuries suffered because of misconduct during an arbitration. Hornsby's NASD claim is, in substance, a collateral attack on the original arbitration, and it is precluded under section 10.

*Prudential Securities Inc. v. Hornsby*, 865 F.Supp. 447, 451-2 (N.D. Ill. 1994).  These comments were echoed by the Sixth Circuit in *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc*.:

> The FAA provides the exclusive remedy for challenging acts that taint an arbitration award whether a party attempts to attack the award through judicial proceedings or

through a separate second arbitration. It would be a violation of the FAA to allow Decker to arbitrate the very same claims that we have determined constitute an impermissible collateral attack when previously presented for adjudication by a court. Decker may not bypass the exclusive and comprehensive nature of the FAA by attempting to arbitrate her claims in a separate second arbitration proceeding.

205 F.3d 906 (6th Cir. 2000). MTS does not have the right to suspend confirmation of an award that the FAA says "must" be confirmed so that it can collaterally attack it with a second arbitration, and then come back and seek modification or vacatur after the three month deadline on grounds that are not only unknown now, but unknowable.

**E.      Delaying Confirmation would Greatly Prejudice DRIVE and Osentoski**

The Panel hammered MTS in the underlying arbitration because it found that in addition to its "substantive torts" it had willfully abused the arbitration process. The defense of MTS' frivolous assertions required DRIVE to incur in excess of $400,000 in attorneys fees and other expenses, including over $66,000 in arbitrators fees.

48.      The evidence established that as a direct result of MTS' conduct, DRIVE was compelled to let half of its employees go and convert its office lease to a month by month arrangement. ***Exhibit K.*** Larry Osentoski invested his savings in the company and has gone months without pay because the MTS litigation consumed all of DRIVE's cash. *Id.* The evidence established that MTS drove DRIVE to the brink of bankruptcy. Now it wants leave to finish the job. Simply put, DRIVE does not have the resources to wait a year or two for the confirmation of the award.

49.      Notably, despite specific inquiry by the DRIVE Parties, MTS has pointedly *not* offered to post any security whatsoever for this arbitration award. Were MTS to have its way, it could spend the next two years squandering and hiding assets, leaving DRIVE holding a worthless judgment when the arbitration award is finally confirmed.

50.     Lastly, MTS should not be heard to suggest the second arbitration would be quick or inexpensive.  For one thing, as noted above, MTS' current local counsel, who had nothing to do with the underlying arbitration, do not represent it in the second, thus there is little reason to believe that MTS' litigation tactics will experience an ethical turnaround.  Furthermore, MTS already stated that it believes the discovery period alone in the second arbitration should take 12 full months.  *See Exhibit J to MTS Petition for Partial Vacatur.*  The second arbitration has yet to begin – indeed, for the last three months, MTS has asked for and received permission to stay it pending the outcome in this case (without ever revealing that its intention, in fact, was to then stay this case in favor of the other).  The AAA has not even proposed potential arbitrators.  It will be months of expense and AAA fees before DRIVE can even obtain the first hearing.  Even then, because the second proceeding is an arbitration, no matter how meritorious, it is an uphill battle to obtain summary judgment.  Thus, despite the existence of an ironclad *res judicata* and collateral estoppel defense, there is every likelihood that the second arbitration will take months and years – time and money DRIVE cannot afford.  Even if MTS does not use the opportunity to hide assets, every dollar it spends on the second arbitration is likely a dollar that DRIVE and BAE will never be able to collect.

## Conclusion

51.     MTS brought and maintained this proceeding in bad faith.  It lost every substantive issue at trial, including the exact claims it seeks to relitigate in Washington.  The Panel, informed by over a year of dealing with MTS' conduct and tactics, went out of its way to make it clear that it considered and ruled upon the merits of MTS' claims and that MTS should not be permitted to assert them again.  The Panel did not do this gratuitously or by accident: it

did so because it had well learned that MTS would continue to abuse the process as long as it was permitted to do so.

52.    There is no authority that would support staying confirmation of this award, which is required by the mandatory language of the FAA.  Even if there were such authority, it would not be justified in this case.

DRIVE Developments Inc. and Larry Osentoski respectfully request that the Court deny the MTS Motion to Stay, confirm the arbitration award attached as Exhibit A, issue a final judgment against MTS, and for all other relief to which they may be entitled.

Respectfully submitted,

**WATT BECKWORTH THOMPSON &
HENNEMAN, L.L.P.**


By:    _____/S/_____
        Joseph G. Thompson III
        Federal ID 16780
        State Bar No. 00788534
        1800 Pennzoil Place, South Tower
        711 Louisiana Street
        Houston, Texas  77002
        Telephone:    (713) 650-8100
        Facsimile:    (713) 650-8141
        **ATTORNEY IN CHARGE FOR PETITIONERS,
        DRIVE DEVELOPMENTS, INC. AND LARRY OSENTOSKI**

**OF COUNSEL**:

Todd S. Frank
Federal ID 28592
State Bar No. 430159813
WATT BECKWORTH THOMPSON & HENNEMAN, L.L.P.
1800 Pennzoil Place, South Tower
711 Louisiana Street
Houston, Texas  77002
Telephone:      (713) 650-8100
Facsimile:      (713) 650-8141

## Certificate of Service

The undersigned hereby certifies that all counsel of record have been served with a copy of Drive Developments, Inc. and Larry Osentoski's Response to MTS' Motion to Stay by electronic means via the Court's electronic filing system on this 21st day of June, 2010.

_____/S/_____

Joseph G. Thompson, III